No. 23-2143 (L)

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

### The Courtland Company, Inc.
*Plaintiff-Appellant*

v.

### Union Carbide Corporation
*Defendant-Appellee*

Appeal from the United States District Court, Southern District of West Virginia,
Judge John T. Copenhaver, Jr., Nos. 2:18-cv-01230, 2:21-cv-00101

## BRIEF OF APPELLEE

R. Scott Masterson, Esq. (WVSB #10730)
Patricia M. Bello, Esq. (WVSB #11500)
LEWIS BRISBOIS BISGAARD & SMITH LLP
707 Virginia Street East, Suite 1400
Charleston, West Virginia 25301
(304) 553-0166 (T) / (304) 932-0265 (F)
scott.masterson@lewisbrisbois.com
patricia.bello@lewisbrisbois.com

Martin A. Shelton (*pro hac vice WVSDC, admitted 4th Cir.*)
LEWIS BRISBOIS BISGAARD & SMITH LLP
600 Peachtree Street NE, Suite 4700
Atlanta, GA 30308
(404) 476-2009
martin.shelton@lewisbrisbois.com
*Counsel for Appellee Union Carbide Corporation*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF ISSUES ................................................................. 1

STATEMENT OF THE CASE ............................................................. 3

    **A.**    **Procedural History** ................................................................. 4

    **B.**    **Courtland I: Findings of Fact** ............................................... 6

    **C.**    **Courtland I: Counclusions of Law – Courtland's CERCLA §§ 107(a) and 113(g)(2) Claims** ............................................... 17

    **D.**    **Courtland III: Findings of Fact** ........................................... 20

    **E.**    **Courtland III: Conclusions of Law – Lack of Standing** ............ 24

SUMMARY OF THE ARGUMENT ..................................................... 29

STATEMENT OF STANDARD OF REVIEW ........................................ 32

ARGUMENT ................................................................................... 35

    **A.**    **The District Court Correctly Held that Courtland Was Not Entitled CERCLA Response Costs in Courtland I** ..................... 35

        1.    *Westfarm* is Controlling Fourth Circuit Precedent for CERCLA Cost Recovery Actions ....................................... 36

        2.    *Westfarm* Applies to All Owners and Operatorys and is Not Limited to "Generators" ............................................. 41

        3.    The District Court's Finding that Tech Park Was not the Source of the Constituents Detected in Courtland's Groundwater Was Not "Clearly Erroneous" ...................... 44

    **B.**    **The District Court Correctly Held in Courtland III that Courtland Failed to Prove an Injury-in-Fact and, Therefore, Lacked Standing to Pursue a Clean Water Act Claim Based Upon Discharges to the Northern Boundary Ditch** ................. 47

        1.    The District Court Applied the Correct Standard for Standing for a CWA Claim ............................................. 48

        2.    The District Court's Factual Findings that Courtland: (1) Failed to Establish "Injury-in-Fact"; (2) Failed to Establish

"Traceability"; and (3) Failed to Demonstrate that Discharges to the Northern Boundary Ditch Can Adversely Affect Courtland or its Upstream Property Were Not "Clearly Erroneous". .......52

**CONCLUSION**.................................................................................58

**CERTIFICATE OF COMPLIANCE** ................................................59

**CERTIFICATE OF SERVICE** .........................................................60

## TABLE OF AUTHORITIES

**Cases**

*Am. Canoe Ass'n v. Murphy Farms, Inc.*,
   326 F.3d 505 (4th Cir. 2003) ..............................................................49

*Amoco Oil Co. v. Borden, Inc.*,
   889 F.2d 664 (5th Cir. 1989) ......................................................37, 38

*Anderson v. Bessemer City*,
   470 U.S. 564 (1985).............................................................................32

*Castiac Lake Water Agency v. Whittaker Corp.*,
   272 F. Supp. 2d 1053 (C.D. Cal. 2003) .............................................37

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983).................................................................................50

*Columbia Gas Transmission, LLC v. Haas*,
   837 Fed. Appx. 155 (4th Cir. 2020)....................................................33

*Concrete Pipes and Prod. v. Construction Laborers Pension Trust*,
   508 U.S. 602 (1993)..............................................................................33

*Equinor USA Onshore Props. Inc. v. Pine Res., LLC*,
   917 F.3d 807 (4th Cir. 2019) ..............................................................33

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,
   204 F.3d 149 (2000)........................................... 25, 26, 49, 53, 54, 55

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,
   629 F.3d 387 (4th Cir. 2011) ................................................31, 49, 54

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167, 120 S. Ct. 693 (2000)................................26, 49, 50, 53

*Gilbane Bldg. v Federal Reserve Bank of Richmond*,
   80 F.3d 895 (4th Cir. 1996) ................................................................33

*Helton v. AT&T Inc.*,
   709 F.3d 343 (4th Cir. 2013) ..............................................................33

*HRW Sys., Inc. v. Wash. Gas Light Co.*,
    823 F. Supp. 318 (D. Md. 1993) ........................................................................ 37

*Innis Arden Golf Club v. Pitney Bowes, Inc.*,
    629 F. Supp. 2d 175 (D. Conn. 2009) ............................................................... 41

*Krygoski Constr. Co. v. City of Menominee*,
    431 F. Supp. 2d 755 (W.D. Mich. 2006) ......................................................... 40

*Lewis v. Casey*,
    518 U.S. 343, 116 S.Ct. 2174 (1996) ............................................................... 50

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ....................................................... 25, 48, 49, 52, 53, 54

*M.V.B. Collision Inc. v. Progressive Ins. Co.*,
    2023 U.S. Dist. LEXIS 209486 (E.D.N.Y. Nov. 22, 2023) ............................. 48

*Minyard Enters., Inc. v. Southeastern Chem. & Solvent Co.*,
    184 F.3d 373 (4th Cir. 1999) ............................................................................ 33

*N.C. Shellfish Growers Ass'n v. Holly Ridge Assocs., LLC*,
    278 F. Supp. 2d 654 (E.D.N.C. 2003) ............................................................. 50

*New York v. Shore Realty Corp.*,
    759 F.2d 1032 (2d Cir. 1985) ........................................................................... 43

*Ohio Valley Envtl. Coal. v. Foal Coal Co., LLC*,
    274 F. Supp. 3d 378 (S.D. W. Va. 2017) .......................................................... 50

*Ohio Valley Envtl. Coalition, Inc. v. Maple Coal Co.*,
    808 F.Supp.2d 868 (S.D.W. Va. 2011) ....................................................... 31, 54

*PCS Nitrogen Inc. v. Ashley II of Charleston, LLC*,
    714 F.3d 161 (4th Cir. 2013) ............................................................................ 37

*PEM Entities LLC v. Cnty of Franklin*,
    57 F.4th 178, 182 (4th Cir. 2023) ..................................................................... 48

*Piney Run Pres. Ass'n v. Cty. Comm'rs*,
    268 F.3d 255 (4th Cir. 2001) ............................................................................ 50

*Plasterers' Local Union No. 96 Pension Plan v. Pepper*,
    663 F.3d 210 (4th Cir. 2011) ...............................................................32

*United States v. Acoff*,
    2024 U.S. App. LEXIS 3707 (4th Cir. 2024) ....................................33

*United States v. Am. Cyanamid Co.*,
    1997 U.S. Dist. LEXIS 4413 (S.D. W. Va. 1997)..............................44

*United States v. Monsanto Co.*,
    858 F.2d 160 (4th Cir. 1988) ......................................................40, 43

*United States v. Roy*,
    88 F.4th 525 (4th Cir. 2023) ...............................................................32

*Va. House of Delegates v. Bethune-Hill*,
    587 U.S. 658, 139 S. Ct. 1945 (2019)................................................48

*Westfarm Assocs. Ltd. P'ship v. Wash. Suburban Sanitary Comm'n*,
    66 F.3d 669 (4th Cir. 1995) ........................................... 18-20, 29, 35-38, 40-44

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990)..............................................................................48

**Statutes**

Clean Water Act ("CWA"), 33 U.S.C. §§ 1262(a), 1365................................passim

Comprehensive Environmental Response, Compensation and Liability
    Act ("CERCLA"), 42 U.S.C. §§ 9607(a), 96313(g)...................................passim

Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §
    6972.................................................................................................................4, 6

West Virginia Hazardous Waste Management Act, W.V.Code §22-18, *et seq*........4

**Court Rules**

Fed. R. App. P. 32 ......................................................................................59

Fed. R. Civ. P. 52 ......................................................................................32

## STATEMENT OF THE ISSUES

**A.    Civil Action No. 2:18-cv-01230 ("Courtland I")**

1.    Whether the United States District Court for the Southern District of West Virginia ("district court") applied the appropriate legal standard when ruling in favor of Union Carbide Corporation ("UCC") on Count I in Courtland I—the Courtland Company, Inc.'s ("Courtland") cause of action for recovery of response costs and declaratory relief under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA").

2.    Whether the district court's finding in favor of UCC on Count I of Courtland I was based upon a clearly erroneous factual finding that the UCC Technical Center ("Tech Park") was not the source of the constituents detected in Courtland's groundwater.

**B.    Civil Action No. 2:21-cv-00101 ("Courtland III")**

3.    Whether the district court applied the correct standard when deciding that Courtland lacked standing under the Clean Water Act ("CWA") to pursue Count I of the Courtland III Complaint.

4.    Whether the district court's finding that Courtland lacked standing under the CWA to pursue Count I in Courtland III was based upon clearly erroneous factual findings that: (1) Courtland failed to establish "injury-in-fact"; (2) Courtland failed to establish "traceability"; and (3) Courtland failed to demonstrate

that discharges to the Northern Boundary Ditch and Ward Branch Seep can adversely affect the Courtland Property—which is situated upstream of the alleged discharges.

## STATEMENT OF THE CASE

Appellant, Courtland, appeals final decisions in two of four cases consolidated for trial decided by perhaps the most experienced jurist in the United States. The district court acted as both the presiding judge and the finder-in-fact. Following weeks of trial in this complex environmental case, and after careful review of the voluminous evidence presented, the district court issued a meticulously thorough 416-page Memorandum Opinion and Order. The district court resolved a multitude of factual disputes that required close consideration of detailed technical and scientific data as well as expert testimony. "Herculean" is the best way to describe the district court's efforts in presiding over the trial, analyzing the evidence, and authoring a 416-page Opinion. JA10585. The district court's rulings were fair and its attention to detail undeniable. The district court's factual findings were substantiated, and its legal findings were fully supported.

Nevertheless, Courtland argues that the district court applied incorrect legal standards and made "clearly erroneous" factual findings. Nothing was incorrect about the district court's application of legal standards. Nothing was erroneous—let alone "clearly erroneous"—about the district court's findings or interpretation of the evidence. Great deference should be shown to the district court because the district court's findings required weighing conflicting evidence and judging credibility. Courtland fails to present a cogent argument that the district court applied incorrect

legal standards or made "clearly erroneous" factual findings.

This Court should, therefore, affirm the district court.

## A. Procedural History

From July 6 to August 3, 2022, Judge John T. Copenhaver, Jr. of the United States District Court for the Southern District of West Virginia conducted and presided over an 18-day bench trial on claims asserted by Courtland in four civil actions: Civil Action No. 2:18-cv-01230 ("Courtland I"), Civil Action No. 2:19-cv-00894 ("Courtland II"), Civil Action No. 2:21-cv-00101 ("Courtland III"), and Civil Action No. 2:21-cv-00487 ("Courtland IV").

This appeal concerns Courtland I and Courtland III only.

### 1. Courtland I (Civil Action No. 2:18-cv-01230)

Courtland I was filed on August 15, 2018. JA0005; JA0047. Broadly speaking, Courtland alleged that UCC, over the years, conducted activities at Tech Park that polluted both UCC's property and property owned by Courtland ("Courtland Property"). JA1064.

Courtland asserted the following causes of action, in Courtland I, in relation to Tech Park: (1) recovery of response costs and declaratory relief under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607(a), 96313(g) ("Count I") and (2) citizen suit relief for alleged violation of § 7002(a)(1)(A) of the Resource Conservation and Recovery

Act ("RCRA"), 42 U.S.C. § 6972 (a)(1)(A) and alleged violation of the West Virginia Hazardous Waste Management Act.[1] JA1064-1065.

Courtland challenges only the district court's findings as to Count I. Pertinent to this appeal, the district court dismissed Count I—Courtland's CERCLA §§ 107(a) and 113(g)(2) claims. JA1262. The district court found that "UCC has demonstrated, by a preponderance of the evidence, that Tech Park is not the source of the constituents detected in Courtland's groundwater." JA1262. This factual finding was dispositive, and accordingly, the district court ruled in favor of UCC on Count I.

### 2.    Courtland III (Civil Action No. 2:21-cv-00101)

Courtland III was filed on February 9, 2021. JA1973, JA2003. In Courtland III, Courtland alleged that unpermitted discharges of pollutants emanated from UCC's former Filmont Landfill ("Filmont") into nearby navigable waters in violation of Sections 402(a) and 505 of the Clean Water Act ("CWA"). JA2479. Courtland's CWA claims in Courtland III, related to alleged discharges from Filmont to the Northern Boundary Ditch and directly from a seep, known as the "Ward Branch Seep" (collectively referred to herein as the "Northern Boundary Ditch"). JA2479.

The district court dismissed Courtland's claims in Courtland III for lack of

---

[1] In Courtland I, Courtland also asserted claims for violation of RCRA § 7002(a)(1)(B), imminent and substantial endangerment, public nuisance, private nuisance, negligence, gross negligence, and strict liability. At trial, Courtland voluntarily dismissed these claims against UCC. JA1266.

standing. JA2863. As the finder-of-fact, the district court determined that Courtland failed to factually demonstrate that Courtland suffered an "injury-in-fact" or establish "traceability" with respect to the alleged discharges to the Northern Boundary Ditch. JA2861-2863.

### B.     Courtland I: Findings of Fact

The district court made the following findings of fact pertinent to the instant appeal in Courtland I:

### 1.     The Greenhouse Area of Tech Park: Regulatory History and Investigation.

Tech Park consists of two distinct areas: Ward Hollow, which includes three inactive landfills: Lower Ward Landfill, Ward A Landfill, and Ward B Landfill (collectively referred to as "Ward Hollow"), and the Greenhouse Area. JA1067. Of the two distinct areas at Tech Park, the Courtland Property is downgradient of only the Greenhouse Area. JA1071.

The Tech Park was designated as a "Large Quantity Generator." JA0055 at ¶ 20. Since August 5, 1981, and continuing to present day, UCC has possessed and operated Tech Park under some form of a RCRA permit issued by the United States Environmental Protection Agency ("USEPA") and/or the West Virginia Department of Environmental Protection ("WVDEP"). JA1068.

UCC did not dispute that, on certain occasions in the past, contaminants were

released from Tech Park at certain locations via contaminated groundwater.[2] JA1067-1068. Discharges from Tech Park were historically investigated, evaluated, and well-understood. Beginning in 1988 and continuing through 2010, UCC completed numerous USEPA-approved investigations to determine the nature and extent of contaminated groundwater migration from Tech Park. JA1070. These investigations assessed both Ward Hollow and the Greenhouse Area. JA1071.

While contaminated groundwater was determined to be migrating off-site from Ward Hollow to two downgradient properties,[3] "no such determination of off-site mitigation has ever been made with respect to the Greenhouse Area of Tech Park." JA1071. As part of the RFIs[4] conducted at Tech Park, the Greenhouse Area was recommended for "No Further Action"—a recommendation approved by the USEPA. JA1071-1072. In accordance with the USEPA's 2010 Final Decision, UCC has continued to monitor the groundwater in both the Greenhouse Area and Ward Hollow. JA1072.

The groundwater monitoring conducted by UCC with USEPA oversight, which spanned over many years, demonstrated that groundwater in the Greenhouse Area was contaminated. JA1076-1077. The key constituents of concern were: (1)

---

[2] Groundwater is the water found underground that moves through geologic formations.

[3] The West Virginia Department of Transportation ("WVDOT") property and the CSX Transportation property.

[4] RFI stands for RCRA Facility Investigation.

tetrachloroethylene ("PCE"), (2) trichloroethylene ("TCE"), and (3) chloroform. JA0666, JA1076. Groundwater monitoring data from two of the monitoring wells located in the Greenhouse Area[5] also detected arsenic, barium, selenium, chromium, acetone, methyl ethyl ketone (also known as 2-Butanone), and di-n-butyl phthalate ("DBP"). JA1093-1095, JA1948-1953. Except for arsenic, none of these constituents were detected in the Greenhouse Area at levels exceeding their designated MCL (maximum contamination level) or RSL (risk screening level). JA1094, JA1097. There was no evidence in the record that such constituents were designated as "key constituents of concern" in the Greenhouse Area. JA1094.

### 2.    The Courtland Property

On January 7, 1980, Courtland acquired the Courtland Property due to its zoned industrial location and for investment purposes. JA1062, JA1081. The Courtland Property is a 13.8-acre parcel of land in South Charleston, West Virginia. JA1062.

In relation to Tech Park, the Courtland Property is downgradient of the Greenhouse Area only. JA1071. The Courtland Property is not downgradient from the Ward Hollow area of Tech Park. JA1075. This was important to the district court's analysis because, as the district court explained: "as a matter of hydrology, groundwater contamination emanating from the Ward Hollow area of Tech Park

---

[5] Monitoring wells MW104A and WVU-MW04.

cannot impact the Courtland Property." JA1075. "[G]roundwater contamination emanating from Ward Hollow cannot flow uphill and then subsequently impact the Greenhouse Area of Tech Park or the Courtland Property." JA1075-1076.

Before Courtland's ownership, the Courtland Property was used to store coal piles in the 1950s through the early-1970s. JA1081. Courtland's corporate representative and vice president, John Truslow, testified that the Courtland Property has been referred to as "the coal yard" due to its historic use as a coal storage property. JA0440-0441, JA1081.

Since Courtland's acquisition in January 1980, the Courtland Property has been leased to two separate entities and used as a storage, staging, and waste site for construction equipment, debris, and materials. JA1082. Most recently, in 2008, Courtland leased the property to Raynes and Sons Excavation, LLC ("Raynes"). From 2008 to present day, Raynes has utilized the Courtland Property for recycling operations and for the storage of dirt, asphalt millings, concrete, asphalt chunks, wood chips, barriers, pipes, metals, rebar, other steel materials, and various pieces of heavy equipment. JA1083, JA1545-1563. A 1,000-gallon diesel tank as well as various 5-gallon buckets containing hydraulic oil and motor oil scattered around the property are also present on the Courtland Property. JA1083, JA1545-1563.

3.    **Sampling at the Courtland Property: Courtland's August 2017 Groundwater Sampling and UCC's December 2020 Soil Sampling**

In August of 2017, Courtland's expert, Dr. Scott Simonton ("Dr. Simonton"), installed three borings in the most upgradient, southeast portion of the Courtland Property. JA1085. The three borings were installed ten to twelve feet apart in this location and screened at three different depths: 15-feet, 30-feet, and 45 to 50-feet. JA1085. The following constituents were detected in the grab samples:

|  | **Grab Sample No. 1** | **Grab Sample No. 2** | **Grab Sample No. 3** |
|---|---|---|---|
| Mercury | 0.0018 mg/L[6] | 0.000088 mg/L |  |
| Arsenic | 0.52 mg/L | 0.056 mg/L | 0.0030 mg/L |
| Barium | 6.4 mg/L | 2.3 mg/L | 0.098 mg/L |
| Cadmium | 0.0094 mg/L | 0.00055 mg/L |  |
| Chromium | 0.86 mg/L | 0.24 mg/L | 0.054 mg/L |
| Lead | 1.0 mg/L | 0.19 mg/L | 0.0013 mg/L |
| Selenium | 0.12 mg/L | 0.026 mg/L | 0.0055 mg/L |
| Silver | 0.0016 mg/L |  |  |
| DBP | 16 ug/l[7] |  |  |
| Acetone | 4.7 ug/l | 5.2 ug/l | 41 ug/l |
| 2-Butanone |  |  | 3.6 J ug/l |

JA1086-1088. Neither silver nor DBP were detected during the second or third grab sample. JA1087-1088. Further, unlike the first two samples, neither mercury nor cadmium were detected in the third sample, and 2-Butanone was detected in the third sample for the first time. JA1088.

---

[6] Milligrams per liter

[7] Micrograms per liter

The district court examined Dr. Simonton's groundwater sampling and underlying methodology. As the district court noted was "of some concern," Dr. Simonton did not prepare a scope of work, develop a field-sampling plan, prepare any report describing the methodology he employed during this sampling, or conduct any testing to account for existing baseline conditions on the Courtland Property. JA1088-1089, JA0804-805. Despite Dr. Simonton acknowledging multiple potential sources of contamination, both historic and current, at the Courtland Property, Dr. Simonton admitted he did not conduct any sampling or testing to rule out other potential sources of the constituents existing on the Courtland Property. JA1089, JA0795, JA0851.

In connection with its August 2017 groundwater sampling, Courtland incurred $36,916.25 in costs. JA1086. Although Courtland conducted groundwater sampling in August of 2017, Courtland did nothing to remediate the contaminants detected on the Courtland Property. JA1089-1090; JA0856-0858. The district court observed: "Notably, despite being aware since 2017 that contamination on the Courtland Property exists, Courtland has taken no action, nor has it made any plans to remediate or clean up the same." JA1089-1090; JA0856-0858.

On December 16 and 17, 2020, UCC conducted a limited soil investigation on the Courtland Property to identify what contaminants were present in the Courtland Property's soil. JA1090, JA1536-1543 (Def's Ex. 79). The December

2020 soil sampling identified 16 volatile organic compounds (VOCs), 18 metals, and 17 semi-volatile organic compounds (SVOCs). JA1536-1543. Nine of the eleven hazardous substances detected in Dr. Simonton's August 2017 groundwater sampling were *also* detected in UCC's December 2020 soil sampling: arsenic, barium, cadmium, chromium, lead, mercury, selenium, 2-butanone, and acetone. JA1092. Except for chromium, 2-Butanone, and acetone, all of the constituents were detected at levels exceeding one or more of the soil screening levels. JA1092-1093. Silver and DBP were not detected in Courtland's soil but were detected in Courtland's groundwater. JA1093.

### 4.   Comparison of Constituents and Source of Contamination at the Courtland Property

The district court compared the constituents detected at the Greenhouse Area of Tech Park to those detected in the Courtland Property's soil and groundwater. The district court found that four metals (arsenic, barium, chromium, and selenium) and three organic compounds (acetone, DBP, and 2-Butanone) were detected on both the Courtland Property and in the Greenhouse Area. JA1098.

Examining the evidence presented at trial, however, the district court found that the Greenhouse Area was *not* the source of constituents detected in Courtland's groundwater (*i.e.,* detected in Dr. Simonton's 2017 groundwater sampling event). JA1112. In reaching this factual finding, the district court was tasked with analyzing scientific data, geographic topography, and conflicting expert testimony. UCC

presented Peter de Haven ("Mr. de Haven") as its expert. Courtland presented Dr. Simonton as its expert.

Mr. de Haven testified that it was highly improbable that the constituents detected on the Courtland Property emanated from the Greenhouse Area. JA1098, JA0875-0876. Mr. de Haven presented two primary reasons.

First, Mr. de Haven explained that the groundwater traveling from the Greenhouse Area likely diverted away from the Courtland Property. JA1099, JA0881-0882. According to Mr. de Haven, before the groundwater traveling through the bedrock from the Greenhouse Area would meet the alluvial groundwater valley flowing under the Courtland Property, much of that groundwater emerges as a seepage face on the bedrock outcrop and could thus either evaporate or get caught in various ditches and be diverted away from the Courtland Property via surface water. JA1099, JA0881-0882.

Second—and as the district court recognized as "even more importantly"—Mr. de Haven testified that, even assuming that all of the groundwater flowing from the Greenhouse Area joins into the alluvial groundwater on the Courtland Property, a significant factor of dilution would occur as the groundwater flow from the Greenhouse Area of Tech Park merges into the alluvium given the vastly different groundwater flow systems between the two properties. JA1100, JA0881. In this regard, Mr. de Haven explained:

> And that is directly relevant here because we know that there is a little bit of presence of some of the constituents of interest named in the complaint on the Greenhouse – on the Greenhouse portion of the site, but not very much. But if we were to take that constituent presence, those concentrations, and dilute it by the amount that we're talking about, it would be undetectable on the Courtland [P]roperty. That's really a key point because what that means is even, **even if you assume the contaminants, those contaminants, those low levels of contaminants that we have in the Greenhouse area moving to Courtland, you could never detect those contaminants [on the Courtland Property],** which means that **the contaminants** that were detected **on the Courtland [P]roperty must have gotten there for some other reason.**

JA1100, JA0882-0883 (emphasis added).

Ultimately, Mr. de Haven opined that if groundwater from the Greenhouse Area carried contaminants to the Courtland Property groundwater, the low level of contaminants would be significantly diluted and undetectable on the Courtland Property. JA1101.

The district court correctly recognized that the groundwater data shows that the constituents detected on both properties (including DBP, on which Courtland now focuses) were detected in *higher* concentrations on the Courtland Property than the Greenhouse Area. JA1101. Notably, the "key constituents of concern" in the Greenhouse Area (PCE, trichloroethylene, and chloroform) were *not* detected in the August 2017 groundwater sampling on the Courtland Property. JA1103, JA1477-1493 (Pl. Ex. 268-1), JA1494 (Pl. Ex. 451-2).

Based upon the past and current uses of the Courtland Property, Mr. de Haven

testified that it was "much more likely" that the Courtland Property *itself* is the

source of the contaminants detected in the groundwater under the Courtland

Property. Mr. de Haven testified:

> Q:    In your opinion, do – what, what is your opinion with respect to whether or not there's any correlation between what was later found in the soils and what was found in 2017 in groundwater?
>
> A:    Well, given that so many of the metals observed in the soil concentrations are above screening levels that will give you an indication as to whether they can cause unacceptable levels in groundwater, there certainly seems to be that correlation, yes.
>
> Q:    Okay. And, in your opinion, what does that tell us with respect about whether Tech Park is the cause of the impacts to groundwater?
>
> A:    It adds another major layer of doubt as to that assertion. We've already – I've already gone through all the other lines of evidence, you know, based on looking at Tech Park data in its own right and the flow systems moving from Tech Park to Courtland to address that question. Now you have this additional line of evidence showing that it's quite likely that Courtland is its own source of constituents to groundwater that in my mind makes it even more unlikely, even more implausible that Tech Park would be the source of the constituents to Courtland.

JA1105, JA0985.

As the district court correctly noted, the fact that the Greenhouse Area was

approved for "No Further Action" by the USEPA bolstered Mr. de Haven's opinion

that the contaminants in the Greenhouse Area are not migrating to the Courtland

Property. JA1106.

The district court analyzed the credibility and veracity of Dr. Simonton's

testimony. The district court found that Dr. Simonton's testimony was based "**entirely on assumptions and generalizations**." JA1107 (emphasis added). Dr. Simonton testified that, just because concentrations of constituents may have been higher on a downgradient property (the Courtland Property) does not necessarily mean that the upgradient property (the Greenhouse Area) is not the source of the contamination. JA1107, JA0818-0820. Dr. Simonton testified that if a source is constant, then concentrations at the source are going to be a higher concentration generally than the downgradient source. JA1107, JA0818-0820. However, according to Dr. Simonton, if the contaminant source is not constant, and the contaminant is introduced in the form of a "slug," then the "slug" will move away from the contaminant source and the concentration will be higher in the "slug." JA1107.

The district court correctly noted that Dr. Simonton never directed the court to any actual evidence that would support his "slug" theory. JA1107. Dr. Simonton was "assuming" that whatever sources contaminated Tech Park have stopped and thus any contamination remaining in the Greenhouse Area of Tech Park "is the residual of those slugs." JA1107, JA0819. As the district court explained, Dr. Simonton was "unable to identify the sources of any of the constituents detected on the Greenhouse Area…." JA1108.

Ultimately, the district court viewed Mr. de Haven's opinions as more credible

than Dr. Simonton's opinions. JA1112. In assessing the credibility of the conflicting experts, the district court found Mr. de Haven's demeanor was "forthright" and his explanations "informative and overall consistent with the data and evidence presented." JA1111. Mr. de Haven appeared "highly knowledgeable" and was "direct and non-evasive" in his testimony at trial, regardless of the examiner. JA1111. Conversely, the district court found that Dr. Simonton's opinions were "lacking clarity and unsupported by anything other than generalities and assumptions." JA1111. Dr. Simonton was "at times[,] circuitous, hard to follow, and conclusory in his responses." JA1112.

### C.     Courtland I: Conclusions of Law – Courtland's CERCLA §§ 107(a) and 113 (g)(2) Claims

As explained in the district court's Order, "[a]t the summary judgment stage, the district court concluded that Courtland had proven a prima facie case as to its CERCLA cost recovery claim in relation to Tech Park and that *UCC had adduced evidence from which a trier of fact could find that UCC's Tech Park was not the source of contamination found on the Courtland Property*." JA1245 (emphasis added). For purposes of trial, the district court found that the only issue remaining was "whether the evidence presented by UCC at trial demonstrates that Tech Park was not the source of the contamination detected on the Courtland Property in the August 2017 sampling conducted thereon." JA1245.

Although the district court's Order addressed each element of Courtland's

CERCLA claims according to the evidence presented at trial, the instant appeal focuses only on two issues: (1) the district court's reliance on and application of this Court's standard articulated in *Westfarm Assocs. Ltd. P'ship v. Wash. Suburban Sanitary Comm'n,* 66 F.3d 669, 681-82 (4th Cir. 1995); and (2) whether UCC presented sufficient evidence at trial to establish a lack of casual nexus between the Greenhouse Area and the Courtland Property.

The district court properly identified that this case involved two contaminated sites: the Greenhouse Area of Tech Park and the Courtland Property. As to causation, the district court cited *Westfarm*'s holding that "the burden of proof as to causation in a CERCLA case **lies with the defendant**." JA1260 (citing *Westfarm*, 66 F.3d at 681) (emphasis added). The district court considered both the Greenhouse Area and the Courtland Property as "contaminated sites." JA1260. "[I]n matters involving two contaminated sites, such as this, the plaintiff must only prove that contaminates[,] which were once in the custody of the defendant[,] **could have** travelled onto the plaintiff's land, and that subsequent contaminants (chemically similar to the contaminants once existing in defendant's custody) on the plaintiff's land caused the plaintiff to incur cleanup costs." JA1260 (citing *Westfarm*, 66 F.3d at 681) (emphasis added). Once the plaintiff establishes that contaminants ***"could have"*** travelled onto its property, the burden then shifts to the defendant to establish that the defendant was likely not the source of contamination. JA1260. As the district court correctly

explained, to defeat CERCLA liability, the defendant is tasked with demonstrating by a preponderance of the evidence that it was "<u>not</u> the source of the contamination." JA1260 (citing *Westfarm*, 66 F.3d at 681) (emphasis in original).

### 1. The District Court Found Courtland Satisfied the First Part of the *Westfarm* Analysis.

Before the burden shifted to UCC to establish a lack of causation, Courtland first needed to satisfy the first part of the *Westfarm* analysis: the Greenhouse Area and the Courtland Property had common contaminants and the contaminants "could have" travelled onto the Courtland Property. JA1260 (citing *Westfarm*, 66 F.3d at 681).

Applying the standard articulated in *Westfarm*, the district court concluded that Courtland established contaminants once in UCC's custody at Tech Park "*could have*" travelled onto the Courtland Property. JA1261. The district court found that the Greenhouse Area was upgradient to the Courtland Property. JA1261. The district court also held that Courtland demonstrated that contaminants chemically similar to the contaminants once existing in UCC's custody (namely, arsenic, barium, chromium, selenium, acetone, DBP, and 2-Butanone) were likewise detected in the August 2017 groundwater sampling on the Courtland Property, which resulted in Courtland expending $36,916.25 on such preliminary investigation. JA1261. As a result, the district court found that Courtland satisfied this initial burden and presented a *prima facie* CERCLA claim.

## 2.     UCC Satisfied the Second Part of the *Westfarm* Analysis.

Because Courtland satisfied its preliminary burden, the district court's analysis moved to the second part of *Westfarm*: whether UCC proved a lack of causal nexus between Tech Park and the contaminants present on the Courtland Property and groundwater underneath the Courtland Property. The district court found that UCC satisfied this burden and proved that no causal nexus existed between Tech Park and the contaminants found on the Courtland Property. JA1262. The district court held that, consistent with the findings and credibility assessments of Mr. de Haven and Dr. Simonton, and in viewing the entirety of the evidentiary record, "UCC has demonstrated by a preponderance of the evidence, that ***Tech Park is not the source of the constituents detected in Courtland's groundwater***." JA1262 (emphasis added).

This factual finding undeniably involved weighing evidence and judging credibility. The district court had to weigh conflicting testimony and judge the credibility of conflicting experts. JA1262. After doing so, the district court found in favor of UCC on Courtland's CERCLA §§107(a) and 113(g)(2) claims in Courtland I. UCC was not liable for the $36,916.25 Courtland spent on its August 2017 groundwater sampling investigation. JA1262.

## D.     Courtland III: Findings of Fact

UCC highlights the following factual findings made by the district court

pertinent to Courtland III:

In 1946, UCC acquired real property upon which Filmont and Massey Railyard are located. Filmont and Massey Railyard are two separate sites located on the same parcel of land.

### 1.    Filmont Landfill

Filmont began operations in or around 1950, and from the mid-1970s until approximately 1987, Filmont was operated as an inert waste landfill. JA2531, JA2533, JA2538. In 1987, prior to the expiration of a then-active state health department permit, Filmont underwent final closure under the supervision of the West Virginia Department of Natural Resources. JA2539, JA2548-2550. Filmont is bordered by Davis Creek (to the west-northwest), Ward Branch and Interstate 64 (to the northeast), Massey Railyard (to the southeast), and the Courtland Property (to the southwest). JA2475-2477.

### 2.    Massey Railyard

Massey Railyard began railyard operations no later than 1971 and is designated as a Very Small Quantity Generator ("VSQG"). JA2530-2531. Massey Railyard is currently used for the staging and storing of railcars. JA2530. There is no evidence that any portion of Massey Railyard has ever been used as a landfill. JA2530. Massey Railyard is bordered by Filmont (to the west), the Courtland Property (to the south), Ward Branch and Interstate 64 (to the north), and Kanawha

Turnpike (to the east). JA2475-2477.

### 3. Northern Boundary Ditch

The Northern Boundary Ditch is an intermittent surface water feature that receives stormwater and some limited water from seeps. JA2805. It is approximately 1,200 feet in length. JA2805. The Northern Boundary Ditch starts near the eastern part of Massey Railyard and proceeds along the northern side of Filmont. JA2805. After gradually sloping downhill from eastern Massey, the ditch crosses a corner portion of Filmont and then runs at the foot of northern Filmont before terminating in Ward Branch. JA2805. The Northern Boundary Ditch is located mostly, but not entirely, on property owned by the WVDOT and lies in between Filmont on the ditch's southern edge and the embankment of I-64 on its northern edge. JA2805. The district court found that the Northern Boundary Ditch appears to be a manmade structure. JA2805. It also found that the Northern Boundary Ditch is a drainage feature, which fairly may be described as "a ditch." JA2806-2807.

### 4. Ward Branch

Ward Branch runs in a westerly direction on the north or far side of I-64, before Ward Branch turns southward toward Filmont, crossing under I-64 through a culvert. JA2807. Ward Branch reaches Filmont where it turns 90 degrees to the west at what is called its "elbow." JA2807. The Northern Boundary Ditch connects with Ward Branch at a point between the culvert and the elbow. JA2807. The district

court estimated the distance from the elbow of Ward Branch to the confluence of Ward Branch and Davis Creed as approximately 400 feet. JA2807-2808. The district court found that the Northern Boundary Ditch is a point source as it functions as a discernible confined and discrete conveyance of certain pollutants from Filmont into Ward Branch. JA2808.

The Courtland Property is upstream of any discharges to the Northern Boundary Ditch and the Ward Branch Seep. JA2859.

### 5.    Davis Creek and Waterflow in Relation to the Courtland Property.

Davis Creek, which in addition to Ward Branch, is the nearby navigable water upon which Courtland's CWA claim is based, runs in a northerly direction as it descends, in sequence, from near the western line of Tech Park and continuing on the western line of Courtland and Filmont on its way to the Kanawha River. JA2803. Davis Creek originates in the Kanawha State Forest, approximately 10 to 12 miles to the south of Courtland's and UCC's properties. JA2803. The Northern Boundary Ditch is a tributary of Ward Branch, which is a tributary of Davis Creek. JA2256. At the north end of Filmont, Ward Branch flows into Davis Creek, which eventually intersects with the Kanawha River approximately 0.3 miles north of its confluence with Ward Branch. JA2803-2804.

On occasion, Davis Creek "back[s] up," causing its water level to rise slowly due to heavy precipitation. JA0428-0429, JA2804. When this occurs, the water in

Davis Creek does not "eddy on itself backwards." JA0428-0429, JA2804. Nor did evidence adduced at trial show Davis Creek to have backed up onto the Courtland Property. Rather, "backwater[s]" manifest in Davis Creek at its junction with the Kanawha River and which may extend to the Ward Branch area. JA2804. "That is, water levels in Davis Creek and Ward Branch may rise after heavy precipitation due to 'back[ing] up' at the Kanawha River downstream, but the direction of the water flow ***does not*** reverse backwards in Davis Creek or Ward Branch." JA2804 (emphasis added).

### E. Courtland III: Conclusions of Law – Lack of Standing

In its July 1, 2022 Memorandum Opinion and Order, the district court held that "*for purposes of summary judgment*, Courtland established that it has standing to bring its Clean Water Act claims against UCC concerning discharges into and from…the Northern Draining Ditch and into Ward Branch." JA2271 (emphasis added). The district court left open the question of whether Courtland would carry its burden, at trial, to establish that Courtland had standing for its CWA claim in Courtland III.

Recognizing that "standing remains an issue," the district court considered standing in its September 28, 2023 Order. JA2857-2863. The district court ruled that Courtland failed to demonstrate that it suffered an "injury-in-fact" resulting from alleged discharges to the Northern Boundary Ditch. JA2857-2863. The district court

acknowledged that Section 505(g) of the CWA [33 U.S.C. § 1365(g)] sets forth the statutory standing requirement for citizen suits. JA2857 (citing *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 152 (2000); 33 U.S.C. § 1365(g)). Section 505(g) defines "citizen" to mean a "person or persons having an interest which is or may be adversely affected." JA2857. The district court recognized that "Congress has indicated that this provision confers standing to enforce the Clean Water Act to the full extent allowed by the Constitution." JA2857. "Standing has been held to consist of three prongs: (1) injury-in-fact, (2) traceability, and (3) redressability." JA2858 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992)).

Because Courtland pursued a citizen suit under the CWA, the district court analyzed—based upon the evidence at trial—whether Courtland satisfied all three elements of standing: injury-in-fact, traceability, and redressability. Ultimately, the district court ruled that Courtland failed to establish injury-in-fact or traceability.[8]

## 1.    Injury-in-Fact

The district court analyzed whether Courtland suffered an injury-in-fact in relation to discharges to the Northern Boundary Ditch. The district court accurately explained that a plaintiff "may carry its burden of proving injury in fact if it [1]

---

[8] Based on its findings that Courtland failed to established injury-in-fact or traceability, the district court did not address redressability.

**utilizes the affected area** and has reasonable concerns about the effects of [] discharges, or [2] those discharges **directly affect a legally protected interest**, be it recreational, aesthetic, or economic." JA2858-2859 (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,* 528 U.S. 167, 183-84 (2000)) (emphasis added). "[A] plaintiff 'must only show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific area of concern.'" JA2859 (citing *Gaston Copper*, 204 F.3d at 161).

The Courtland Property was upgradient of the discharges to the Northern Boundary Ditch. In an attempt to establish injury-in-fact, Courtland advanced the "unconventional theory" that the Davis Creek's flow sometimes *reverses direction* from south-north to north-south. JA2859-2860. Courtland used this "reverse direction" theory to argue that discharges to the Northern Boundary Ditch were deposited on the Courtland Property via the Davis Creek.

The district court rejected Courtland's reverse direction theory. JA2860. "Far from supporting its theory of reverse flow, the plaintiff has merely shown that Davis Creek can 'back[] up' during periods of heavy precipitation." JA2860. "This amounts to nothing more than Davis Creek's water level rises after heavy precipitation." JA2860. The fact that Davis Creek's water "sometimes rises," in the district court's view, did not establish injury-in-fact. JA2860-2861. The district court concluded, "there is no evidence that contaminated water from Ward Branch ever

entered Davis Creek and then flowed backwards to the Courtland Property, nor is there any evidence that this *may* occur." JA2860-2861 (emphasis added).

> Put simply, pollution that enters Ward Branch flows ***away from the Courtland Property, not towards it,*** which the Court estimates is in excess of 600 feet upstream from where Ward Branch meets Davis Creek…No mechanism transports these pollutants to the Courtland Property, Courtland has not asserted a broader aesthetic or recreational interest which might be affected by distant discharges. Nor has it shown an affected economic interest. Because the Courtland Property is upstream of these discharges, it simply is not "a citizen who sits squarely in the discharge zone of a polluting facility."

JA2861 (emphasis added).

Based upon the district court's factual finding that Courtland did not suffer an injury-in-fact, Courtland failed to establish standing with respect to alleged discharges to the Northern Boundary Ditch. JA2862.

## 2.    Traceability

"For much the same reasons," the district court also found that Courtland failed to prove traceability: a genuine nexus between Courtland's alleged injury and UCC's violative conduct. JA2863. "Courtland has not demonstrated any nexus between these discharges and any potential adverse effects to its interests inasmuch as there is no evidence to support its improbable theory of reverse flow." JA2863.

Due to lack of traceability and lack of injury-in-fact, the district court held that Courtland failed to show it has standing to bring CWA claims based upon discharges

to the Northern Boundary Ditch. Accordingly, the district court dismissed

Courtland's sole remaining claim in Courtland III. JA2863.

# SUMMARY OF THE ARGUMENT

Courtland asks this Court to reverse two portions of the district court's 416-page Order.

*First*, in Courtland I, Courtland asks this Court to reverse the district court's judgment in UCC's favor on Count I—Courtland's CERCLA claim seeking response costs and declaratory judgment. Count I pertained to alleged contamination from the Greenhouse Area of Tech Park onto the Courtland Property. According to Courtland, the district court's analysis and application of *Westfarm Assocs. Ltd. P'ship v. Wash. Suburban Sanitary Comm'n,* 66 F.3d 669, 681-82 (4th Cir. 1995) was erroneous. Courland argues that, once Courtland established a "harm" and/or "threat of harm" in support of its CERCLA claim, the analysis stops and the second-part of *Westfarm* does not apply. Courtland also challenges the district court's factual finding that contaminants on the Courtland Property did not emanate from Tech Park.

Courtland's propositions are incorrect and unsupported. Initially, Courtland cites no precedent to support its contention that, once Courtland established a *prima facie* CERCLA claim, then UCC was foreclosed from proving a lack of causal nexus between Tech Park (specifically the Greenhouse Area) and the Courtland Property. *Westfarm* is good law. *Westfarm* undeniably supports the district court's view that UCC, in defense of Courtland's CERCLA claim, had the ability to prove that

contaminates found on the Courtland Property did not emanate from Tech Park. *See Westfarm*, 66 F.3d at 681 ("Because the defendant bears the burden of proof as to causation, a defendant…must come forward with sufficient evidence from which a jury could find that the defendant was *not* the source of the contamination.").

UCC satisfied this burden, and the district court correctly ruled in UCC's favor. The district court's finding that Tech Park did not contaminate the Courtland Property was factually supported, involved weighing conflicting evidence, and was based upon judging expert credibility. As such, the district court should be affirmed.

*Second*, in Courtland III, Courtland argues that the district court erred by finding that Courtland lacked standing to pursue Count I—Courtland's CWA claims based upon alleged discharges into the Northern Boundary Ditch. Courtland argues that it was clearly erroneous when the district court concluded that Courtland failed to establish "injury in fact" and "traceability"—both necessary elements to establish standing.

None of the district court's findings in relation to Courtland's lack of standing were "clearly erroneous." The district court correctly ruled that Courtland failed to establish standing to pursue a CWA claim for "distant discharges," for which Courtland has not asserted a broader aesthetic, recreational, or economic interest which might be affected. JA2861-2862.

This Court should reject Courtland's attempt to fill the evidentiary gap to

establish "injury-in-fact" on appeal when Courtland failed to satisfy this burden at trial. The district court was correct: Courtland was an "upstream user" and could not demonstrate how "the impacts of the alleged violations are felt in an area with which the plaintiffs have a 'direct nexus.'" JA2861-2862 (citing *Ohio Valley Envtl. Coalition, Inc. v. Maple Coal Co.*, 808 F.Supp.2d 868, 882 (S.D. W.Va. 2011), quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 397 (4th Cir. 2011)). This factual finding was accurate and certainly not "clearly erroneous."

Accordingly, this Court should not disturb the district court's findings and should affirm the district court's judgments in Courtland I and Courtland III.

## STATEMENT OF STANDARD OF REVIEW

Factual findings may be reversed only if clearly erroneous. *Plasterers' Local Union No. 96 Pension Plan v. Pepper*, 663 F.3d 210, 215 (4th Cir. 2011). Rule 52 of the Federal Rules of Civil Procedure provides:

(a)    Findings and Conclusions

                                    \*\*\*

(6) *Setting Aside the Findings*. Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.

Fed. R. Civ. P. 52.

Under the clearly erroneous standard, the question is not whether the reviewing court would have decided a question differently. *Pepper,* 663 F.3d at 215. The standard is plausibility: whether the district court's account of the evidence is plausible in light of the record in its entirety. *Anderson v. Bessemer City*, 470 U.S. 564, 573-74 (1985). A factual interpretation that is not "illogical or implausible" is not "clearly erroneous." *See id.* at 577. Likewise, a contested fact or one subject to debate is not "clearly erroneous." *United States v. Acoff*, 2024 U.S. App. LEXIS 3707, \*6 (4th Cir. 2024) (citing *United States v. Roy*, 88 F.4th 525, 532 (4th Cir. 2023) ("…Contested facts are hardly the same as clearly erroneous ones")); *accord Anderson v. Bessemer City*, 470 U.S. at 574 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

Furthermore, a finding is not clearly erroneous and cannot be reversed unless the reviewing court has a "definite and firm conviction that a mistake has been committed." *Minyard Enters., Inc. v. Southeastern Chem. & Solvent Co.*, 184 F.3d 373, 380 (4th Cir. 1999).

The clearly erroneous standard is "significantly deferential." *United States v. Acoff*, 2024 U.S. App. LEXIS 3707, *6 (4th Cir. 2024) (citing *Concrete Pipes and Prod. v. Construction Laborers Pension Trust*, 508 U.S. 602, 623 (1993)). This Court "will not 'substitute our version of facts for that found by the district court.'" *Columbia Gas Transmission, LLC v. Haas*, 837 Fed. Appx. 155, 161-162 (4th Cir. 2020) (quoting *Equinor USA Onshore Props. Inc. v. Pine Res.*, LLC, 917 F.3d 807, 813 (4th Cir. 2019)). "[A] 'court's factual findings that turn on assessments of witness credibility or weighing of conflicting evidence during a bench trial…are entitled to even greater deference.'" *Id*. at 162 (quoting *Helton v. AT&T Inc*., 709 F.3d 343, 350 (4th Cir. 2013)).

To the extent Courtland asserts the district court committed a purely legal error (not dependent upon factual findings), UCC agrees that a *de novo* standard of review would apply to legal issues. *See Gilbane Bldg. v Federal Reserve Bank of Richmond*, 80 F.3d 895, 905 (4th Cir. 1996). However, the appellate issues presented in this appeal depend upon the district court's factual findings—each of which is subject to the "clearly erroneous" standard of review. The determinative factual

issues underlying the district court's findings enjoy significant deference and cannot be vacated absent a finding that the district court's factual findings were clearly erroneous.

## **ARGUMENT**

This appeal challenges only two of the district court's decisions: (1) Courtland was not entitled to recover its alleged response costs sought under CERCLA Section 107(a), 42 U.S.C. § 9607(a) and CERCLA Section 113(g), 42 U.S.C. § 9613(g); and (2) Courtland lacked standing to pursue its sole remaining claim under the CWA, 33 U.S.C. §1365, based upon alleged discharges to the Northern Boundary Ditch.

On each issue, Courtland argues that the district court applied the "wrong" legal standard yet fails to articulate any cognizable alternative or explain why the well-settled law the district court followed was incorrect. Substantively, Courtland's primary dispute with the district court is a factual one. Courtland argues that the district court improperly assessed the facts, but woefully fails to demonstrate that any of the district court's finding, in its 416-page Order, were "clearly erroneous."

### A.     The District Court Correctly Held that Courtland Was Not Entitled CERCLA Response Costs in Courtland I.

Courtland asserts that the district court applied the wrong legal standard and made "clearly erroneous" findings when holding, in Courtland I, that Courtland was not entitled to recover CERCLA response costs under 42 U.S.C. § 9607(a).[9] JA1262.

The district court applied the standard acknowledged in *Westfarm*. Although

---

[9] The district court's Order focused on analysis of liability under CERCLA §107(a). Finding that UCC was not liable for Courtland's requested response costs, the district court then dismissed the CERCLA §§ 107(a) and 113(g)(2) claims asserted in Count I of Courtland I. JA1262.

Courtland asserts that standard acknowledged in *Westfarm* is incorrect, Courtland does not provide a standard alternative to the one articulated in *Westfarm*. Instead, Courtland argues that the district court should have applied only the first part of *Westfarm*: Courtland's burden to establish a *prima facie* case. Courtland ignores the second part of *Westfarm*: UCC's ability to prove a lack of causation. *See Westfarm*, 66 F.3d at 681-82. According to Courtland, the law prevents UCC from proving that contaminants on the Courtland Property did not and could not have emanated from Tech Park.

Courtland's proposition lacks support. *Westfarm* is good law, *Westfarm* articulates the proper standard, and this Court should decline Courtland's invitation to modify *Westfarm* in accordance with Courtland's truncated version that removes the second part of the analysis.

### 1.    *Westfarm* is Controlling Fourth Circuit Precedent for CERCLA Cost Recovery Actions.

CERCLA Section 107(a) provides that any owner or operator of a facility, any transporter of hazardous substances, or anyone who arranged for the treatment or disposal of hazardous substances may be liable for response costs incurred by an impacted party. 42 U.S.C. § 9607(a).

> "CERCLA encourages private individuals to clean up environmental hazards by permitting them to recover specified costs of cleanup from parties defined by CERCLA to be responsible for the hazards." Westfarm Assocs. Ltd. P'ship v. Wash. Suburban Sanitary Comm'n, 66 F.3d 669, 677 (4th Cir. 1995).

A private-party plaintiff establishes a prima facie case for cost recovery under CERCLA by establishing that (1) the defendant is a potentially responsible person ("PRP"); (2) the site is a CERCLA "facility"; (3) a hazardous substance has been released or threatens to be released from the defendant's facility; and (4) the release or threatened release has caused the plaintiff to incur response costs that are "necessary" and "consistent with the National Contingency Plan." <u>See PCS Nitrogen Inc. v. Ashley II of Charleston, LLC</u>, 714 F.3d 161, 167-68 (4th Cir. 2013); <u>see also</u>, <u>Westfarm</u>, 66 F.3d at 677 (noting cost-recovery elements and stating the claimant must show it incurred necessary response costs).

"Contrary to the rule followed in most areas of the law, the burden of proof as to causation in a CERCLA case lies with the defendant." <u>Westfarm</u>, 66 F.3d at 681. As our Court of Appeals has stated, "[t]he plaintiff must prove only that contaminants which were once in the custody of the defendant could have travelled onto the plaintiff's land, and that subsequent contaminants (chemically similar to the contaminants once existing in defendant's custody) on the plaintiff's land caused the plaintiff to incur cleanup costs." <u>Id.</u>; <u>see also Castiac Lake Water Agency v. Whittaker Corp.</u>, 272 F. Supp. 2d 1053, 1066 (C.D. Cal. 2003) (concluding that "in a two-site CERCLA case, the plaintiff meets its burden . . . if it (a) identifies [a] contaminant at its site, (b) identifies the same (or perhaps a chemically similar) contaminant at the defendant's site, and (c) provides evidence of a plausible migration pathway by which the contaminant could have traveled from the defendant's facility to the plaintiff's site."). The presence of "any detectable amount" of a hazardous substance, without regard to concentration, is sufficient. <u>HRW Sys., Inc. v. Wash. Gas Light Co.</u>, 823 F. Supp. 318, 340 (D. Md. 1993); <u>see also Amoco Oil Co. v. Borden, Inc.</u>, 889 F.2d 664, 669 (5th Cir. 1989).

The plaintiff need not, however, "produce any evidence that the contaminants did flow onto its land from the defendant's land. Rather, once plaintiff has proven a prima facie case, the burden of proof falls on the defendant to disprove causation." <u>Id.</u>; <u>see also Castiac Lake Water Agency</u>, F. Supp. 2d at 1067. . . . Inasmuch as "the defendant bears the burden of proof as to causation," the defendant must demonstrate by a preponderance of the evidence that "the defendant

was <u>not</u> the source of the contamination" to defeat liability. <u>Id.</u> (emphasis in original).

JA1242-1244.

In its argument, Courtland states that only the *first* portion of the standard articulated in *Westfarm* is required here: *i.e.*, Courtland demonstrating the threat of impact to the Courtland Property caused by release from Tech Park. *See* Appeal 23-2143 Doc. 36 at 42-43. Courtland ignores the second part of the *Westfarm* analysis: that is, once the plaintiff meets its initial burden, the burden then shifts to the defendant to prove a lack of causation. *See id*.

The district court correctly applied both parts of the *Westfarm* analysis. Under *Westfarm*, UCC was entitled to present evidence to prove that no causal nexus exists between Tech Park and the contaminants on the Courtland Property or in Courtland's groundwater—which UCC did in this case. *See Westfarm*, 66 F.3d at 681-682.

Courtland fails to cite a single case endorsing its truncated version. Rather, Courtland focuses on CERCLA cases addressing only the *first* part of the *Westfarm* analysis—whether a plaintiff sets forth a *prima facia* CERCLA claim—and cites several cases that address the distinction between "threat of harm" and "actual impact"—a distinction that impacts only the *first* part of the analysis. *See Westfarm*, 66 F.3d at 677.

Courtland does not cite any case to support its argument that the second part of the *Westfarm* analysis does not apply or that a defendant in a CERCLA case is

prevented from proving a lack of causation. Instead, Courtland argues that the district court never should have answered this question because, according to Courtland, once Courtland satisfied its initial burden of proof, the analysis stops.

Courtland provides no support for its position. Further, the district court's decision in UCC's favor with respect to Courtland's CERCLA claim turned on a factual inquiry: did contaminants on the Courtland Property emanate from Tech Park—specifically the Greenhouse Area of Tech Park? "No" was the district court's answer—a finding fully supported by the evidence and far from "clearly erroneous." JA1262.

Courtland also suggests that the district court confused the truncated standard that Courtland espouses with "so called 'two-site cases.'" *See* USCA4 Appeal 23-2143, Doc. 36 at 44. The district court was not confused. Even assuming the distinction between single-site and two-site cases was a relevant consideration, this case *was* a "two-site case": the Courtland Property and Tech Park. Although Courtland decries the district court's use of the Fourth Circuit's uncontroverted legal standard that governs CERCLA cost recovery actions, Courtland fails to enlighten this Court as to the special controlling fact pattern this case presents. Instead, Courtland continues to argue a moot point: that Courtland met its initial *prima facie* burden by establishing a "threat of harm." That is not in dispute. The real dispute, that Courtland attempts to obfuscate, is whether UCC proved a lack of causation.

It is undisputed that Congress intentionally excluded the element of causation from plaintiff's liability case. *United States v. Monsanto Co.*, 858 F.2d 160, 170 n.17 (4th Cir. 1988). Still, Courtland fails to provide any support for its argument that the district court used the wrong legal standard—an argument that contradicts Fourth Circuit precent. *See Westfarm*, 66 F.3d at 681-82. As this Court held: "Congress has, therefore, allocated the burden of disproving causation to the defendant who profited from the generation and inexpensive disposal of hazardous waste. We decline to interpret the statute in a way that would neutralize the force of Congress' intent." *United States v. Monsanto Co.*, 858 F.2d at 170 (acknowledging that disproving causation is part of the defenses listed in CERCLA Section 107(b), 42 U.S.C. § 9607(b)).

Courtland's misguided argument that a defendant should not be able to prove a lack of causation has been rejected by other courts. *E.g.*, *Krygoski Constr. Co. v. City of Menominee*, 431 F. Supp. 2d 755, 763 (W.D. Mich. 2006) ("…CERCLA's strict liability regime did not 'diminish the necessity of demonstrating a causal connection between a release or threatened release and the incurrence of costs by a section 107 plaintiff.'") (citations omitted). Further, adopting Courtland's theory would open the floodgates to opportunistic lawsuits against every environmentally impacted site in the country:

> Under Plaintiffs' legal theory, as long as any response costs are being incurred by a plaintiff, any party that disposed of any hazardous

> substance is liable to compensate that plaintiff. It does not matter what type or amount of hazardous substance was disposed of by the party. Any hazardous substance in any quantity will open the floodgates of liability, and will do so even if the hazardous substance disposed of by the party *is not causing any harm*, *is not threatening to cause any harm*, and *is not any part of the reason a response is needed* and costs of that response are incurred. . . . Plaintiffs' theory is not supported by statute, by precedent, or on policy grounds consistent with statutes and precedents.

*Innis Arden Golf Club v. Pitney Bowes, Inc.*, 629 F. Supp. 2d 175, 186 (D. Conn. 2009) (quoting *Acushnet No. v. Coaters Inc.*, 937 F. Supp. 988, 993 (D. Mass. 1996)) (emphasis added).

The *Westfarm* analysis is the correct standard in the Fourth Circuit and the only standard offered for consideration here.

### 2.     *Westfarm* Applies to All Owners and Operators and is Not Limited to "Generators."

Courtland argues that *Westfarm* is not controlling because: (1) the plaintiff's property in *Westfarm* was contaminated and not just *threatened* with contamination and (2) *Westfarm* only applies to "generators" of hazardous substances or waste. Neither contention has merit.

First, Courtland's attempt to factually distinguish *Westfarm* from this case is immaterial. Courtland spends a sizable portion of its brief arguing that a plaintiff does not have to demonstrate actual contamination, only the *threat* of contamination. CERCLA allows a Section 107(a) plaintiff to meet its initial burden of proof by showing either an actual impact or the *threat* of impact. There is no separate standard

that applies to CERCLA recovery cost claims based upon "actual impact" versus claims based upon "threat of impact." Congress chose to allow plaintiff to meet their initial burden the same way in either instance. *See id.* A plaintiff's ability to pursue a CERCLA claim based upon proof of "threat of impact" simply highlights the lightened standard CERCLA plaintiffs enjoy—it does not suggest that a defendant, in a "threat of impact" claim, is foreclosed from proving a lack of causation. As such, the second part of the *Westfarm* analysis still applies to cases involving "threat of impact."

Second, *Westfarm* focuses on the liability of a facility's owners and operators, much like the CERCLA statute itself. *Westfarm* did not mention "generator" at all. There, the defendant, Courtland Washington Suburban Sanitary Commission ("WSSC"), was an operator of a sewer system. *Westfarm*, 66 F.3d at 673. Westfarm's property abutted a laboratory ("IFI") that researched dry cleaning techniques. *Id*. at 674. IFI disposed of gallons of tetrachloroethylene ("PCE") into the sewer line. *Id*. at 674.The sewer lines operated by WSSC had flaws and defects leading to contamination of groundwater with PCE. *Id*. at 674. On appeal of WSSC's liability, the Fourth Circuit held that the burden of proof shifted to defendant WSSC after the plaintiff established a prima facie case. 66 F.3d at 681 (WSSC failed to disapprove the causation and thus was liable.).

Notably, the fact pattern in *Westfarm* is strikingly similar to the case at bar: a

plaintiff property (Courtland) near a research facility (Tech Park) where hazardous substances are used and disposed of (*i.e*., generated in a release to the environment). If WSSC is considered a generator, then Tech Park should similarly be considered a generator.

*Westfarm* relied upon a prior precedent *United States v. Monsanto Co*., 858 F.2d 160, 170 (4th Cir. 1988), which Courtland contends was a "generator case." While *Monsanto* does have "generator" defendants, it also involved a site-owner defendant. In *Monsanto*, the site owner leased the property to a company, which stored hazardous waste generated by the generator defendants. Because the contaminants on the site were indivisible, the site owner and generators were jointly and severally liable, and the Court did not distinguish the liabilities between site owner and generators. *Id.* at 166 (The site-owner owned the site "at the time hazardous substances were deposited"); *id*. at 168 ("The plain language of [CERCLA] section 107(a)(2) extends liability to owners of waste facilities...").

When analyzing liabilities, *Monsanto* relied upon *New York v. Shore Realty Corp*., 759 F.2d 1032 (2d Cir. 1985). In *New York v. Shore Realty Corp*., the defendant was the site owner that purchased the property after hazardous waste was stored on-site. *Id*. at 1044. The defendant did not participate in the generation or transportation of the waste, yet the Court stated that Section 9607(a) of CERCLA imposed the same strict liability on the owner of a facility, regardless of causation.

*Id*.

In sum, none of the abovementioned cases distinguish between owners, operators, or generators when analyzing CERCLA liability under Section 9607(a). Moreover, *Westfarm* has been applied in a case involving transporter or arranger liability as well. *E.g.*, *United States v. Am. Cyanamid Co.*, 1997 U.S. Dist. LEXIS 4413, at *57 n. 25 (S.D. W.Va. 1997) ("Under the controlling law of the Court of Appeals for the Fourth Circuit, once the Subscribing Parties demonstrate that Shell shipped contaminants to the Site and that chemically similar contaminants caused them to incur clean-up costs, ***the burden shifts to Shell to disprove causation***") (citing *Westfarm*, 66 F.3d 669, 68-182) (emphasis added).

Finally, even arguing that *Westfarm* applies only to "generator" sites, Courtland overlooks its own complaint that correctly states that Tech Park was designated by the regulatory agency as a "Large Quantity Generator." JA0055 at ¶ 20.

Thus, *Westfarm* firmly applies.

### 3. The District Court's Finding that Tech Park Was Not the Source of the Constituents Detected in Courtland's Groundwater Was Not "Clearly Erroneous."

Courtland's true argument is a factual one: the district court clearly and erroneously failed to consider that DBP could have come from Tech Park. Courtland argues that the district court "wholly failed to address the detected presence of DBP"

in the groundwater at both sites. USCA4 Appeal 23-2143 Doc. 36 at 54-55.

This contention is easily proven false because the district court acknowledged the presence of DBP on both sites. JA1095-1099. The district court found that "four metals: arsenic, barium, chromium, and selenium, and three organic compounds: acetone, **DBP**, and methyl ethyl ketone (also known as 2-Butanone) have been detected on **both** the Courtland Property and in the Greenhouse Area of Tech Park." JA1098 (citing Pl. Ex. 451-2; Pl. Ex. 268-1) (emphasis added).

Courtland criticizes the district court for not adopting Courtland's factual arguments but fails to demonstrate that the district court's factual findings were clearly erroneous. The district court outlined its thorough review of the sampling evidence from both sites and the analysis and conclusions of both UCC's expert Mr. de Haven and Courtland's expert Dr. Simonton over the course of twenty-seven pages of the final order. *See* JA1085-1112. The district court considered whether Tech Park was a source of the DBP detected on the Courtland Property and rejected that contention based on the evidence. Although the district court evaluated the basis for its conclusion in detail, it is summed up by this observation: "[b]ased on all of the foregoing, Mr. de Haven definitively testified that Tech Park could not be a source of the constituents detected in Courtland's groundwater if only for the reason of the topic of major difference in flow systems between Tech Park and Courtland." JA1103.

Courtland argues that the district court should not have relied on Mr. de Haven's testimony. Courtland again fails to offer any concrete evidence to support this position. Courtland does not even attempt to bolster its own expert's testimony, which was evaluated and discounted by the district court. The district court reviewed all of the evidence and relevant testimony of the expert witnesses in detail in the final order. As the trier of fact, the district court was quite open about its comparison of the two experts' opinions and why it chose to give more weight to Mr. de Haven:

> In conclusion, the court credits Mr. de Haven's testimony with respect to these issues over that of Dr. Simonton's. The demeanor of Mr. de Haven was forthright, and his explanations were informative and overall consistent with the data and evidence presented. Additionally, Mr. de Haven appeared highly knowledgeable in the areas in which he provided opinions, and he was direct and non-evasive irrespective of which party was eliciting his testimony.

> While Dr. Simonton provided contrary opinions, the court finds the same to be lacking in clarity and unsupported by anything other than generalities and assumptions. . . . As to Dr. Simonton's demeanor on the witness stand during this portion of the trial, he was at times circuitous, hard to follow, and conclusory in his responses. For all of these reasons, the court finds the opinions offered by Mr. de Haven to be more credible than those contrary opinions offered by Dr. Simonton.

> Accordingly, the court finds that UCC has established that the Greenhouse Area of Tech Park is not the source of constituents detected in Courtland's groundwater.

JA1111-1112.

In response to this thorough and deliberate analysis of the facts, Courtland offers only its differing opinion that the district court could have, or should have,

ruled in a different manner. Courtland offers nothing to demonstrate that the district court's analysis of the evidence is clearly erroneous and cannot prove the same.

**B.    The District Court Correctly Held in Courtland III that Courtland Failed to Prove an Injury-in-Fact and, Therefore, Lacked Standing to Pursue a Clean Water Act Claim Based Upon Discharges to the Northern Boundary Ditch.**

Courtland contends that the district court erred in holding that Courtland lacked standing to pursue a CWA claim based upon stormwater discharges to the Northern Boundary Ditch. Courtland asserts that, as a CWA citizen suit plaintiff, it is entitled to special consideration or a separate, more relaxed, standard for standing than that established by the United States Supreme Court.

However, Courtland does not, and cannot, provide any legal support for this concept. Courtland's unsupported proposition bastardizes the concept of association standing by arguing that a citizen suit plaintiff can bring a claim for any environmental harm without meeting the three fundamental proofs of standing: injury-in-fact, traceability, and redressability. Appeal 23-2143, Doc 36 at 58-68. Courtland seems to argue that, having established standing for one claim, Courtland is automatically entitled to standing to all other purportedly similar environmental claims, even if asserted in a separate lawsuit. *Id.* at 59-60.[10] Having pronounced its

_____

[10] As discussed below, one fatal flaw with applying this inventive new concept here is that there was only one claim pending in Courtland III – the claim for which Courtland does not have standing.

entitlement to special consideration for standing without citation to supporting precedent, Courtland's factual analysis then fails to either support its contention or to demonstrate clear error by the district court in its review as the trier of fact. Indeed, Courtland has not provided any factual support for standing during trial or on appeal.

### 1.      The District Court Applied the Correct Standard for Standing for a CWA Claim.

The standard for standing in environmental cases is well settled. As the district court stated, "[t]he requirement that a party possess standing is an 'irreducible constitutional minimum' intended to 'identify those disputes which are appropriately resolved through the judicial process.'" JA2857 (Order p. 387) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). A court "may not issue any decision on the merits without confirming that standing exists." *PEM Entities LLC v. Cnty of Franklin*, 57 F.4th 178, 182 (4th Cir. 2023). "As a jurisdictional requirement, standing to litigate cannot be waived or forfeited…To cross the standing threshold, the litigant must explain how the elements essential to standing are met." *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 662-663 (2019). "[J]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *M.V.B. Collision Inc. v. Progressive Ins. Co.*, 2023 U.S. Dist. LEXIS 209486, at *10 (E.D.N.Y. 2023) (quoting *Shipping Fin. Serv. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998). Standing must be demonstrated at each

stage of the litigation, including trial, where Courtland had the burden to prove standing "supported by evidence adduced at trial." JA2858 (quoting *Lujan*, 504 U.S. at 561).

Following its prior holding in *Lujan*, also an environmental citizen suit, the United States Supreme Court affirmed the standing requirements in a CWA citizen suit as articulated in *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 180-81 (2000): "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury-in-fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and  (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 180-81.

Accordingly demonstrating standing in this case required Courtland to show an injury to Courtland and not injury to the environment.

The Fourth Circuit in *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp*., 204 F. 3d 149, 153-54 (4th Cir. 2000) acknowledged the standing requirements consistently with *Laidlaw* and *Lujan*. *Id.* at 153-54; *accord Friends of the Earth, Inc. v. Gaston Copper Recycling Corp*., 629 F.3d 387, 396 (4th Cir. 2011) (a citizen group must meet the constitutional and statutory standing requirements for a citizen suit under CWA*); Am. Canoe Ass'n v. Murphy Farms, Inc*., 326 F.3d 505,

518 (4th Cir. 2003) (applying the *Gaston Copper* standing standard to a citizen suit); *Piney Run Pres. Ass'n v. Cty. Comm'rs,* 268 F.3d 255, 262 (4th Cir. 2001) (applying the *Gaston Copper* standard to a citizen suit); *Ohio Valley Envtl. Coal. v. Foal Coal Co., LLC,* 274 F. Supp. 3d 378, 384 (S.D. W. Va. 2017) ("In order to bring any action in federal court, a plaintiff must have standing—that is, a plaintiff must have a sufficient personal stake in the outcome of the matter being litigated to make it justiciable under Article III of the Constitution."); *N.C. Shellfish Growers Ass'n v. Holly Ridge Assocs., LLC*, 278 F. Supp. 2d 654, 662 (E.D.N.C. 2003) (applying the *Gaston Copper* standard to citizen suit).

Courtland does not cite to any contravening holdings and does not argue the standing requirements applied by the district court were incorrect. Courtland fails to cite any case, statute, or rule to support the proposition that Courtland should be allowed to pursue claims for any and all alleged violations irrespective of whether the specific violation caused an injury-in-fact. Appeal 23-143, Doc. 36 at 59.

A plaintiff must demonstrate standing for each claim or type of relief sought. *Laidlaw*, 528 U.S. at 186; *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) (holding plaintiff had standing to pursue damages but not to pursue injunctive relief); *accord Lewis v. Casey*, 518 U.S. 343, 358, n.6 (1996) ("Standing is not dispensed in gross").

Courtland had the burden to establish standing for each CWA claim it brought,

which Courtland failed to do in Courtland III with respect to the single remaining CWA claim in Courtland III based upon alleged discharges to the Northern Boundary Ditch.

Despite this longstanding precedent, Courtland argues that once it demonstrated standing for *any* of its CWA claims, based upon *any* discharge, it automatically has standing for any and all CWA claims—even claims based upon discharges that did not cause Courtland to suffer an injury-in-fact.

The primary flaw in Courtland's argument—aside from lacking legal support—is that *none* of the discharges alleged in Courtland III caused Courtland to suffer an injury-in-fact. Courtland did not have standing to pursue *any* of Courtland's pending CWA claims in Courtland III. It is also not the case that Courtland had standing to pursue some CWA claims in Courtland III that somehow "transferred" to other CWA claims in Courtland III. In Courtland III only one of Courtland's CWA claims remained pending at trial: a CWA claim based upon alleged discharges to the Northern Boundary Ditch. All of Courtland's other CWA claims in Courtland III were dismissed at the motion to dismiss stage and not within the scope of this appeal. JA1394-1385. Indeed, in Courtland III, only one CWA claim was pending at trial: the CWA claim for which it cannot establish standing. JA0175. There is no other claim in Courtland III for which Courtland could have, much less actually did establish standing. The district court followed and applied the correct Supreme Court

precedent, and Courtland has not provided or articulated any applicable alternative.

> **2.    The District Court's Factual Findings that Courtland: (1) Failed to Establish "Injury-in-Fact"; (2) Failed to Establish "Traceability"; and (3) Failed to Demonstrate that Discharges to the Northern Boundary Ditch Can Adversely Affect Courtland or its Upstream Property Were Not "Clearly Erroneous."**

In Courtland III, after reviewing the evidence adduced at trial, the district court determined that Courtland failed to establish standing for its sole remaining CWA claim. Specifically, Courtland argues that it demonstrated a nexus of injury that is fairly traceable and redressable thus establishing standing. Unfortunately for Courtland, the evidence simply does not support its contention, and all Courtland offers are speculative musings on harm that might occur to someone—not a concrete injury to Courtland. Seeking to avoid its failure here to meet the basic three-prong test of standing, Courtland twists the underlying facts in various standing cases.[11] In that regard, Courtland's factual presentation offered for the first time on appeal are little more than the "mere general averments" and "conclusory allegations" found inadequate in *Lujan*, or the "some day intentions" to visit endangered species halfway around the world, which were deemed insufficient to confer standing

---

[11] Courtland's argument on pages 61-62 of its brief that it preserved various basis to assert standing for appeal is irrelevant in that the district court in fact reviewed all of those basis for standing. Similarly, the assertion that Courtland was deemed to have standing at earlier stages of the litigation is also irrelevant as the Supreme Court has stated that standing must also be proven at trial.

in *Defenders of Wildlife*. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 184.

The district court fairly and thoroughly evaluated Courtland's standing, which was doomed by the fact that the Northern Boundary Ditch is downstream, downhill, and hundreds of feet away from the Courtland Property such that any discharges into the Northern Boundary Ditch flow *away* from both properties without ever impacting the Courtland Property. The district court held:

> Courtland has shown past pollution and virtually present pollution from Filmont into Ward Branch, by direct observation and sampling, but it has failed to demonstrate that these past and present discharges can adversely affect the area of concern, that is, the Courtland Property itself. See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 163 (4th Cir. 2000). Put simply, pollution that enters Ward Branch ***flows away from the Courtland Property***, not towards it, which the court estimates is in excess of 600 feet upstream from where Ward Branch meets Davis Creek. See Jt. Ex. 1A
>
> ***No mechanism transports these pollutants to the Courtland Property***, and ***Courtland has not asserted a broader aesthetic or recreational interest which might be affected by distant discharges***. ***Nor has it shown an affected economic interest***. Because the Courtland Property is upstream of these discharges, it simply is not "a citizen who sits squarely in the discharge zone of a polluting facility." Gaston Copper, 204 F.3d at 162.
>
> In so concluding the court is mindful of decisions that have found standing for plaintiffs which may be a significant distance away from discharges. In Gaston Copper, for example, the Fourth Circuit held that standing existed where the plaintiff's property was four miles away from upstream discharges of pollutants, but pollution from the discharges or the threat of pollution adversely affected the plaintiff's use and enjoyment of his property. 204 F.3d at 152-53, 161-62. Here, the Courtland Property is hundreds of feet away from UCC's discharges

into Ward Branch. The difference between this case and cases such as Gaston Copper is simple. While the impacts of UCC's discharges may conceivably be felt by downstream users of Davis Creek and Ward Branch, given that they would presumably be in the path of such discharges, ***Courtland, as an upstream user, cannot show that "the impacts of the alleged violations are felt in an area with which the plaintiffs have a 'direct nexus*.'"** Ohio Valley Envtl. Coalition, Inc. v. Maple Coal Co., 808 F.Supp.2d 868, 882 (S.D.W. Va. 2011) (quoting Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 629 F.3d 387, 397 (4th Cir. 2011)). Although "[a] threatened environmental injury is by nature probabilistic," Gaston Copper, 204 F.3d at 160, where there is no prospect that a discharge can cause injury to the plaintiff, the plaintiff has failed to move its claim from the realm of the "conjectural or hypothetical" to the "actual or imminent." Lujan, 504 U.S. at 560. The court therefore concludes that Courtland has failed to demonstrate an injury-in-fact for the purposes of standing with respect to the Northern Boundary Ditch and the Ward Branch Seep.

JA2861-2862 (Emphasis added).

In earlier stages of the litigation, Courtland survived questions of standing by asserting the reverse-flow theory that Davis Creek magically reversed flow and carried some unverified pollutant discharge upstream to the Courtland Property. At trial, however, Courtland wholly failed to prove this theory, as described by the district court:

> …Courtland's ability to demonstrate standing with respect to the Northern Boundary Ditch and the Ward Branch Seep in [Count I of Courtland III] insofar as Count I[_] concerns discharges of stormwater associated with industrial activity from Filmont and Massey into the Northern Boundary Ditch, depends upon an unconventional theory, namely, that Davis Creek's flow sometimes reverses direction from south-north to north-south, which results in pollutants being deposited on the Courtland Property and on the banks of Davis Creek abutting its property.

Far from supporting its theory of reverse flow, the plaintiff has merely shown that Davis Creek can "back[] up" during periods of heavy precipitation. Tr. Tran. 491:22-492:17, 508:21-24. This amounts to nothing more than that Davis Creek's water level rises after heavy precipitation. See id. 507:7-24. There also is evidence that the flow of Davis Creek may be impacted to some extent by the presence of the berm, running along the creek's eastern bank. Id. 490:24-491:3. While such effects on Davis Creek are perhaps noteworthy in some sense, providing as they do a fuller picture of how different conditions impact Davis Creek, such evidence nonetheless skirts the essential issue for the purposes of standing, which is: does Davis Creek transport pollutants discharged to Ward Branch upstream to the Courtland Property? In short, there is no evidence that contaminated water from Ward Branch ever entered Davis Creek and then flowed backwards to the Courtland Property, nor is there any evidence that this may occur.

JA2859-JA2861.

Similarly, the district court found that the evidence at trial did not support the

traceability prong of the three-prong constitutional standing test.

For much the same reasons, Courtland cannot demonstrate traceability. The traceability requirement "ensures that there is a genuine nexus between a plaintiff's injury and a defendant's alleged illegal conduct." Gaston Copper, 204 F.3d at 161. While Courtland need not "pinpoint[] the origins of particular molecules" through extensive surface water sampling and laboratory analysis, as UCC insists it must, Courtland at least must "show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific area of concern." Id. at 161-62 (quoting Natural Res. Def. Council, Inc., 954 F.3d at 980). Courtland has not demonstrated any nexus between these discharges and any potential adverse effects to its interests inasmuch as there is no evidence to support its improbable theory of reverse flow.

Accordingly, the court finds that Courtland has failed to demonstrate that it has standing with respect to discharges from the Northern Boundary Ditch and Ward Branch Seep. Having failed to do so, Courtland's claims respecting these point sources in Count I of Courtland III and IV and as to Count II of Courtland IV, insofar as it

relates to discharges of stormwater from Filmont and Massey into the Northern Boundary Ditch and Ward Branch, are DISMISSED.

JA2863.

Courtland's new contention, asserted in this appeal, is that Courtland's nexus of injury to the distant and downstream alleged discharges is economic. This theory also lacks evidentiary support. Courtland contends on appeal that "Courtland has an interest in keeping the area free from pollution as the contamination negatively impacts Courtland's ability to lease, sell, or profitably develop the property." Appeal 23-2143 Doc. 36 at 66-67. Courtland fails to cite to evidence in the record supporting this factual contention. Courtland failed to prove that it suffered an economic harm. Presenting an economic harm argument on appeal does not impact the district court's factual findings based upon the evidence in the record and presented at trial. This is because Courtland's newly advanced "economic harm" theory is contradicted by the overwhelming and uncontroverted evidence that Courtland's own operations significantly contaminated the soils and likely groundwater on the Courtland Property. JA0517-JA0519, JA2495-2497.

Courtland's claim that the marketability of the Courtland Property is negatively impacted is also flatly contradicted by the evidence. The trial testimony of Courtland's representatives established that there was no negative impact on the use or ability to sell or continue to lease the Courtland Property. JA0517-JA0519, JA2495-2497. Notably, in making these assertions, Courtland provides no citation

to the record to show where such evidence was ever offered, and it cannot.

Ultimately, Courtland failed to demonstrate that it suffered an injury-in-fact, which the district court correctly found. Due to a lack of injury-in-fact, Courtland lacked standing to pursue the sole remaining CWA claim in Courtland III. The district court applied the right standard, and none of the district court's findings were "clearly erroneous."

## <u>CONCLUSION</u>

The district court should be commended, not reversed. It applied the correct legal standards, and the district court's findings were well-researched and factually supported. The district court's decisions enjoy great deference because they involved interpreting conflicting evidence and judging credibility. The district court, and not this Court, is in a much better position to analyze the complex evidence as it was presented over the course of an 18-day bench trial. Courtland fails to overcome this heightened level of deference and fails establish that any of the district court's decisions were "clearly erroneous." This Court should reject Courtland's invitation to reverse the district court's findings, all of which were the product of meticulous analysis from an experienced and attentive finder of fact.

This Court should AFFIRM the district court in Courtland I and Courtland III.

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This document complies with the word limit requirements of Fed. R. App. P. 32(a)(7)(B)(i) because it contains **12,937 words**, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document had been prepared in a proportionally spaced typeface using **14-point, Times New Roman**.

*/s/ Patricia M. Bello*
R. Scott Masterson, Esq. (WVSB #10730)
Patricia M. Bello, Esq. (WVSB #11500)
LEWIS BRISBOIS BISGAARD & SMITH LLP
707 Virginia Street East, Suite 1400
Charleston, West Virginia 25301
(304) 553-0166 (T)/(304)932-0265 (F)
scott.masterson@lewisbrisbois.com
patricia.bello@lewisbrisbois.com

Martin A. Shelton (*pro hac vice WVSDC, admitted 4th Cir.*)
LEWIS BRISBOIS BISGAARD & SMITH LLP
600 Peachtree Street NE, Suite 4700
Atlanta, GA 30308
(404) 476-2009
martin.shelton@lewisbrisbois.com
*Counsel for Appellee Union Carbide Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2024, I caused the foregoing Appellee's Brief to be filed and served through the Court's CM/ECF system. All counsel of record are registered CM/ECF users.


*/s/ Patricia M. Bello*
R. Scott Masterson, Esq. (WVSB #10730)
Patricia M. Bello, Esq. (WVSB #11500)
LEWIS BRISBOIS BISGAARD & SMITH LLP
707 Virginia Street East, Suite 1400
Charleston, West Virginia 25301
(304) 553-0166 (T)/(304)932-0265 (F)
scott.masterson@lewisbrisbois.com
patricia.bello@lewisbrisbois.com

Martin A. Shelton (*pro hac vice WVSDC, admitted 4th Cir.*)
LEWIS BRISBOIS BISGAARD & SMITH LLP
600 Peachtree Street NE, Suite 4700
Atlanta, GA 30308
(404) 476-2009
martin.shelton@lewisbrisbois.com
*Counsel for Appellee Union Carbide Corporation*